**GINZBURG & BRONSHTEYN, LLP**
**Yasha Bronshteyn SBN 210248**
**11111 Santa Monica Blvd**
**Suite 1840**
**Los Angeles, California 90025**

**NESENOFF & MILTENBERG,LLP**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

-----------------------------------------------------------------------X

JOHN DOE,                                                    :          Civ. No.
                                                             :
                 **Plaintiff,**       :
                                                             :          <u>**COMPLAINT**</u>
     **-against-**                                      :
                                                             :
                                                             :          **JURY TRIAL**
**REGENTS OF THE UNIVERSITY OF**                            :          <u>**DEMANDED**</u>
**CALIFORNIA,**                                              :
                                                             :
                 **Defendant.**       :

-----------------------------------------------------------------------X

      Plaintiff John Doe [1] (hereinafter referred to as "Plaintiff"), by his attorneys Nesenoff &

Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

<u>**THE NATURE OF THIS ACTION**</u>

      1.      This case arises out of the actions taken and procedures employed by Defendant

the Regents of the University of California, also known as the University of California at Santa

Barbara ("Defendant" or "UCSB" or "UC Santa Barbara") concerning allegations made against

Plaintiff John Doe ("John Doe"), a male senior student at UCSB as a result of false allegations

of nonconsensual sexual activity with fellow UCSB freshman student Jane Doe.

      2.      The allegations purportedly referred to what was clearly consensual sexual

activity between John Doe and Jane Doe that occurred on June 16, 2014, several hundred miles

away from campus, at a privately owned residence and during the summer break (the

"Incident"). At the time, Jane Doe had already been accepted as a transfer student elsewhere.

---

[1] Plaintiff has filed, contemporaneously with this Complaint, a Motion to proceed pseudonymously.

3.      Five months later, on November 6, 2014, John Doe first received notice that he was being charged with a violation of Section 102.08 of the University of California Santa Barbara Campus Regulations, namely "physical abuse, sexual assault, threats of violence, or other conduct that threatens the health or safety of any persons."

4.      Jane Doe was no longer a student at the time, yet curiously, UCSB exercised its jurisdiction to pursue the complaint.

5.      UCSB ultimately found John Doe responsible for sexual assault in violation of Section 102.08 (the "Decision"). UCSB sanctioned John Doe to a two-quarter suspension and prohibited him from participating in any registered campus organizations upon his return (the "Sanction").

6.      There is no basis for the Decision and Sanction. A non-exhaustive list of UCSB's wrongful actions include the following: (i) UCSB failed to conduct a thorough and impartial investigation when it denied John Doe reasonable access to the evidence against him and permitted the inclusion of highly irrelevant and inflammatory statements against John Doe; (ii) the investigative reports selectively adopted certain witness statements to present a skewed rendition of the facts in favor of Jane Doe's narrative of events; (iii) UCSB engaged in an investigation and adjudication process biased against the male accused when it prohibited John Doe from presenting character evidence in support of his defense, while permitting extensive character evidence against him; (iv) UCSB failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard by placing the burden of proof on John Doe to establish that Jane Doe provided consent, rather than placing the burden on Jane Doe, the complainant, to prove that she did not consent; and (v) the Sanction was unwarranted and disproportionate in light of the circumstances, all of which demonstrated substantial procedural errors in violation of Title IX.

7.     When UCSB subjected John Doe to disciplinary action, it did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex. UCSB failed to adhere to its own guidelines and regulations, and the guidelines and regulations themselves are insufficient to protect the rights of male students. The Decision reached was discriminatory in that, given the evidence (or lack thereof), a discriminatory bias against males was required for a conclusion of misconduct to be reached.

8.     John Doe has been greatly damaged by the actions of Defendant UCSB: his educational and career prospects put on hold and the monies spent on obtaining a college education at Defendant UCSB squandered.

9.     John Doe seeks redress against Defendant UCSB due to the actions, omissions, errors, and the flawed procedures, and/or negligence and overall failure to provide John Doe with a meaningful standard of due process and equity, concerning the wrongful allegations of sexual misconduct made against John Doe.

10.     John Doe therefore brings this action to obtain relief based on causes of action for, among other things, violations of Title IX of the Education Amendments of 1972 and state and federal law.

## THE PARTIES

11.     John Doe is a natural person, citizen of the United States, and resident of the State of California. During the events described herein, John Doe was on a leave of absence from UCSB, and had been for the prior two quarters.

12.     Upon information and belief, Defendant UCSB is a public research university located in Santa Barbara, California, with an address of 552 University Road, Santa Barbara, California 93106.

13.     John Doe and Defendant UCSB are sometimes hereinafter collectively referred to as the "Parties."

**JURISDICTION AND VENUE**

14.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and under 28 U.S.C. § 1367 because: (i) John Doe states claims arising under the Constitution and laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and (ii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

15.     This Court has personal jurisdiction over Defendant UCSB on the grounds that it is conducting business within the State of California.

16.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because UCSB is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**I.     Agreements, Representations, Covenants &
Warranties Between John Doe and UCSB**

17.     John Doe worked diligently for four years at an esteemed public high school in Southern California, where he earned a cumulative GPA of 4.06 and took 10 Advanced Placement courses worth 45 credits. An active member of his high school community, John Doe was nominated Class President during his freshman and sophomore year, acted as Captain of the Mock Trial Team, was Copyright Editor of the Yearbook during his junior year, Senior Managing Editor of the Yearbook during his senior year, and was a member of the basketball, volleyball, swimming and football teams.

18.     Setting his sights on a top tier education, John Doe applied to UCSB and was accepted to the College of Letters and Sciences, class of 2015 where he pursued a double major in History and Philosophy and acted as Captain of the Mock Trial team.

19.     Upon his acceptance, Defendant UCSB provided John Doe with copies of its school policies, including the (1) University of California Santa Barbara Student Code of Conduct; (2) University of California Policy-Sexual Harassment and Sexual Violence; and (3) Office of Judicial Affairs Sexual/Interpersonal Violence Response Procedures for Sexual Assault, Dating or Domestic Violence, and Stalking (the "policies"), all of which are available on the University of California's Internet website.

20.     UCSB's policies provide:

In order to carry on its work of teaching, research, and public service, the University has an obligation to maintain conditions under which the work of the University can go forward freely, in accordance with the highest standards of quality, institutional integrity, and freedom of expression, with full recognition by all concerned of the rights and privileges, as well as the responsibilities, of those who compose the University community.

The University is committed to creating and maintaining a community where all individuals who participate in the University programs and activities can work and learn together in an atmosphere free of harassment, exploitation, or intimidation.

Students who are subject to University discipline shall be afforded procedural due process, which is a basic principle underpinning the proper enforcement of University policies and campus regulations. The primary purpose of any University disciplinary proceeding is to determine the guilt or innocence of the accused student.

Proceedings will provide a *prompt, fair, and impartial* investigation and resolution.

The investigator shall apply a preponderance of the evidence standard to determine whether there has been a violation of this Policy.

21.     UCSB'S Sexual/Interpersonal Violence Response Procedures prohibits, *inter alia,* the following conduct:

Physical abuse, sexual assault, threats of violence, or conduct that threatens the health or safety of any persons…"

22.     UCSB's Sexual/Interpersonal Violence Response Procedures defines "sexual assault" as follows:

Sexual Assault occurs when physical sexual activity is engaged without the consent of the other person or when the other person is unable to consent to the activity. The activity or conduct may include physical force, violence, threat, or intimidation, ignoring the objections of the other person, causing the other person's intoxication or incapacitation through the use of drugs or alcohol, or taking advantage of the other person's incapacitation (including voluntary intoxication).

23.     "Consent" is defined by UCSB as follows:

Consent is informed. Consent is an affirmative, unambiguous, and conscious decision by each participant to engage in mutually agreed-upon sexual activity.

Consent is voluntary. It must be given without coercion, force, threats, or intimidation. Consent means positive cooperation *in the*

*act or expression* of intent to engage in the act pursuant to an exercise of free will.

Consent is revocable. Consent to some form of sexual activity does not imply consent to other forms of sexual activity. Consent to sexual activity on one occasion is not consent to engage in sexual activity on another occasion. A current or previous dating or sexual relationship, by itself, is not sufficient to constitute consent. Even in the context of a relationship, there must be mutual consent to engage in sexual activity. Consent must be ongoing throughout a sexual encounter and can be revoked at any time. Once consent is withdrawn, the sexual activity must stop immediately.

Consent cannot be given when a person is incapacitated. A person cannot consent if s/he is unconscious or coming in and out of consciousness. A person cannot consent if s/he is under the threat of violence, bodily injury or other forms of coercion. A person cannot consent if his/her understanding of the act is affected by a physical or mental impairment.

24.     UCSB's policies set forth the procedures by which UCSB students who have been accused of violating one or more of the enumerated policies are investigated, heard, and, possibly, disciplined.

25.     UCSB's Policies expressly covenant to provide the following rights to a student accused of a Student Conduct Code violation.

- The right to written notice of the specific charges, the time and place of the hearing, and a reference to the website containing the procedures that will govern the hearing at least five days prior to the hearing;

- To be accompanied at the hearing by an advisor of his/her choice;

- To be present for the duration of the hearing;

- To produce witnesses and evidence pertaining to the case;

- To question all witnesses; and

- To simultaneously, with the accuser, be informed in writing of the outcome of any institutional disciplinary proceeding, the institution's procedures for appealing the results of the proceeding, any change to the results that occur prior to the time that such results become final, and when such results become final.

26. UCSB's policies encourage early resolution of a complaint, with the intent to resolve concerns at the earliest stage possible. In the event that early resolution is unsuccessful or inappropriate, a formal investigation may be initiated by the Title IX officer or other appropriate official designated to review and investigate sexual harassment complaints, after making a preliminary inquiry into the facts.

27. A formal investigation must be "prompt, fair, and impartial" and generally must include interviews with the parties, interviews with other witnesses as needed, and a review of relevant documents. Additionally, the respondent must receive a full and complete written statement of the allegations and a copy of the applicable policies.

28. Following a formal investigation, the Office of Judicial Affairs will determine whether there is enough evidence to move forward with a charge and if the case should go to a conduct hearing.

29. Formal hearings may be conducted by a committee or hearing officer who will render a decision based on the preponderance of evidence standard. If the accused student is found responsible, the committee will recommend a disciplinary action against the respondent.

The decision regarding a recommendation to suspend or dismiss a student rests with the Vice Chancellor for Student Affairs.

30.     Thereafter, a student may appeal a decision in writing within ten days. An appeal requesting that a sanction be reduced or eliminated must be based on one or more of the following grounds:

- Lack of substantial bases of fact to support the sanction;

- Incongruity of the sanction with the offense;
- Unfairness in the proceedings;
- Newly discovered important evidence not known at the time of the hearing.

31.     The Vice Chancellor for Student Affairs, or the Chancellor, makes the final determination as to the outcome of the appeal.

## II.     The Weekend of June 14-16, 2014

32.     On June 14, 2014, John Doe and Jane Doe, along with a group of friends, traveled to Jane Doe's parents' home in Lake Tahoe for the weekend to celebrate the end of the school-year. Although some of the individuals on the trip happened to be members of the UCSB Mock Trial Team, the trip was in no way sponsored by or affiliated with UCSB.

33.     In the month and a half prior to the trip, Jane Doe had expressed her interest in pursuing a relationship with John Doe, by showing up at his house unannounced on several occasions, late at night, and after she had been drinking. However, John Doe was pursuing a relationship with another student and was only interested in a platonic friendship with Jane Doe.

34.     Throughout the weekend, Jane Doe repeatedly bragged about a previous sexual encounter in which she and a model allegedly engaged in a threesome, with a photographer in New York.

35.     After hearing this story more than once, Witness B.R. became intrigued and inquired whether L.B., a girl with whom he was having a casual sexual relationship, would

consider engaging in a threesome with Jane Doe. Witness L.B. responded that she would ask Jane Doe whether she was interested in participating in a threesome with her and B.R.

36.     On the third night of the trip, June 16, 2014, the group of friends played drinking games such as "drunk jenga" and "king's cup." When they ran out of alcohol, John Doe and a few others made a trip to the nearby convenience store to purchase some more alcohol.

37.     While John Doe was out of the house, L.B. approached Jane Doe in the master bedroom and asked whether she would be interested in having group sex with her and B.R. Subsequently, Jane Doe, L.B. and D.J. advised B.R. that they would be interested in the group sex only if John Doe was also involved.

38.     When John Doe returned to the house, Witness B.R. advised him of B.R.'s earlier conversation with Jane Doe, D.J. and L.B. and inquired whether John Doe would be interested in taking part in the group sex.

39.     John Doe agreed to participate and thereafter followed Witness B.R. to the master bedroom, where Jane Doe, L.B. and D.J. were sitting on the bed, giggling and laughing.

40.     John Doe asked the three girls "are we really going to do this?" to which all three responded "yes," including Jane Doe who was conscious, responsive and did not appear intoxicated to any of the eyewitnesses present.

41.     Unbeknownst to John Doe, L.B., B.R. or D.J., Jane Doe allegedly took a hydrocodone pill for an ankle injury earlier in the evening. Prior to taking the hydrocodone, she consumed approximately two gin and tonic drinks and three shots. After taking the hydrocodone, she allegedly consumed another two or three shots.

42.     Witnesses L.B. and B.R. began to make out, while laying at the foot of the bed. D.J. decided to leave the room, at which point Jane Doe easily could have left as well. However, Jane Doe chose to remain in the master bedroom with John Doe, L.B. and B.R. Jane Doe and

John Doe began to kiss, before walking over to the other end of the bed and laying down next to L.B. and B.R.

43.     Jane Doe kissed John Doe intensely while John Doe began to remove her clothing. Jane Doe lifted up her arms to assist John Doe in removing her shirt, and moved her hips to assist John Doe in removing her pants.

44.     John Doe and Jane Doe engaged in consensual sexual intercourse, during which they switched positions multiple times. At one point, Jane Doe was on top of John Doe. When John Doe initiated oral sex on Jane Doe, she encouraged him by rubbing his hair and expressing her enjoyment verbally.

45.     Jane Doe was an active and willing participant throughout the entire sexual encounter, demonstrating her consent physically, by kissing John Doe passionately, rubbing his hair as he performed oral sex on her and assisting in the removal of clothing; and verbally, by expressing to John Doe that she liked what he was doing.

46.     B.R. and L.B. engaged in sexual intercourse simultaneously. When B.R. became impotent, he suggested that the pairs switch sexual partners. Agreeing to this suggestion, B.R. went over to Jane Doe and John Doe approached L.B.

47.     While John Doe engaged in consensual sexual intercourse with L.B., B.R. was unable to complete the sexual activity with Jane Doe, as a result of his alcohol induced impotence.

48.     When John Doe woke up the next morning, Jane Doe and D.J. were in bed with him. Upon waking, he realized that he had left his cell phone at the convenience store where he went to purchase alcohol the night before. Thus, John Doe traveled to the convenience store to retrieve his cell phone.

49.     Upon John Doe's return to the house, he found Jane Doe, B.R. and L.B. talking and making jokes about how crazy the previous evening had been. He noticed Jane Doe talking and laughing with L.B.

50.     Approximately five months later, on or about November 6, 2014, John Doe first received notice that he was being charged with sexual assault in violation of Section 102.08 of the UCSB General Standards of Conduct; namely, "physical abuse, sexual assault, threats of violence, or other conduct that threatens the health or safety of any persons." John Doe was not permitted an opportunity to review Jane Doe's statement, and was not advised as to the exact nature of the allegations against him until he was interviewed by Assistant Dean of Students Suzanne Perkin ("Ms. Perkin") on November 13, 2014.

51.     On November 25, 2014, John Doe was advised that a hearing would take place on December 11, 2014.

52.     The initial hearing was conducted on December 11, 2014 (the "First Hearing") before the Sexual Violence Conduct Committee (the "Committee"). John Doe, Jane Doe and witnesses D.J, L.B. and B.R. provided their testimony. Subsequently, on December 16, 2014, John Doe was advised by Ms. Perkin that the Committee had deliberated and sought to re-open the hearing to ask all witnesses additional questions. Despite John Doe's indication that his attorney would be available to appear on any date except December 19, the second hearing proceeded before the Committee on December 19, 2014 (the "Second Hearing").

53.     On December 19, 2014, a mere 45 minutes after the Second Hearing took place, the Committee issued a Decision finding John Doe "responsible for the violation of sexual assault." The Committee recommended a two-quarter suspension, as well as exclusion from participating in registered campus organizations upon John Doe's return to campus. The Decision was upheld by Vice Chancellor for Student Affairs Michael D. Young on January 15, 2015.

54.     Subsequent to the issuance of the Decision, John Doe filed an appeal dated January 29, 2015 based on the following grounds: (i) lack of substantial bases of fact to support the sanction; (ii) substantial violations of fair process in the proceedings; (iii) excessive or inappropriate sanction; and (iv) newly discovered important evidence not known at the time of the hearing.  Chancellor Henry T. Yang denied the appeal on February 16, 2015, stating simply "After reviewing your appeal, I am affirming Vice Chancellor Young's decision." Despite the severe implications and significant effects the Decision will certainly have on John Doe's future educational and career endeavors, Chancellor Yang failed to cite the bases for his denial or provide any explanation whatsoever for his decision, in violation of John Doe's rights to fair process.

**III.    UCSB Lacks Jurisdiction to Investigate
         and Adjudicate the Subject Incident**

55.     As a preliminary matter, UCSB did not have jurisdiction to investigate or adjudicate the subject Incident. The UC Santa Barbara General Standards of Conduct state that the University may only exercise jurisdiction over student conduct that occurs off University property in certain situations. In considering whether to exercise such off campus jurisdiction, the University may consider a variety of factors including: (1) whether the alleged victim is a member of campus community; (2) whether a crime has been reported to the criminal authorities; (3) the risk of future harm involved; and (4) whether the off-campus conduct is part of a series of actions that occurred both on and off campus. Any request to extend the University's jurisdiction beyond its typical borders must be reviewed by the Associate Dean for Judicial Affairs, Dean of Students, Vice Chancellor for Student Affairs and a committee composed of both faculty members and students. Indicating the magnitude of extending such jurisdiction beyond its borders is the school's self-imposed requirement that all aforementioned parties be in agreement with the proposal to extend UCSB's jurisdiction.

56.     Yet, in its decision, the Committee fails to even address the issue of extending UC Santa Barbara's jurisdiction to the events of the Incident, let alone ensure that the requisite agreement was obtained by the University prior to commencing its investigation. Notably, the Incident occurred after the conclusion of the spring semester, at a private home located several hundred miles away from campus. Moreover, at the time of the Incident, John Doe was not a current student at UC Santa Barbara; in fact, he was on a leave of absence and had been for the previous two quarters while residing off campus. John Doe had not taken a class at UC Santa Barbara in at least six months, and had not been active with the Mock Trial Team since March of 2014.

57.     Notably, Jane Doe also was not a current student at UC Santa Barbara, as the semester had concluded and her transfer to a University on the east coast had been finalized several months prior. Evidently, neither the alleged victim nor the alleged perpetrator was a member of the campus community. Moreover, a crime was not reported to the criminal authorities, and there was no reasonable risk of future harm to the complainant as Jane Doe had already finalized her transfer to another school and would not be returning to the UCSB campus. Additionally, there was no evidence that the Incident was part of a series of actions that occurred both on and off campus. Consequently, none of the factors which would permit UC Santa Barbara to exercise its jurisdiction over the Incident, pursuant to its *own* Code of Conduct, were present in this matter.

58.     In an attempt to bring this Incident within the purview of UCSB, Ms. Perkin mischaracterizes the setting of the Incident in the First Investigative Report as a "Mock Trial Trip to Lake Tahoe." To the contrary, the subject trip was in no way school sponsored or affiliated; rather, this was a year-end trip organized among a group of friends. The fact that some of the individuals happened to have initially met each other through the University's mock trial group does not bring the Incident within the purview of UC Santa Barbara's jurisdiction

where the Incident occurred off school grounds, took place during the summer break, and, most significantly, neither Jane Doe nor John Doe were current students of UC Santa Barbara. Neither the Courts nor Title IX of the Education Amendments of 1972 explicitly permit a University to discipline an individual who is *not* a current student of that school, for an incident that occurred off campus, on private property, at a private non-school sponsored event. Thus, UCSB lacked jurisdiction to investigate and adjudicate the subject Incident.

### IV.    Failure to Conduct a Thorough and Impartial Investigation

59.    UCSB performed an unfair and biased investigation in favor of Jane Doe's allegations of sexual misconduct, in violation of its own stated policies requiring that disciplinary proceedings be "prompt, fair and impartial."

60.    The University of California's Policy for Sexual Harassment and Sexual Violence provides that the University "encourages Early Resolution of a complaint…" to resolve concerns at the earliest stage possible. Pursuant to UCSB's policies, early resolution generally includes an inquiry into the facts, and may entail mediating an agreement between the parties, separating the parties, referring the parties to counseling programs, negotiating an agreement for disciplinary action, conducting targeted preventive educational and training programs, or providing remedies for the individual harmed by the offense.

61.    Yet, the one futile attempt at Early Resolution of this matter prior to commencement of a formal investigation was the sole inquiry by Ms. Perkin as to whether John Doe was, "ready to take responsibility?" As Ms. Perkin failed to explain that such an inquiry was an attempt to resolve the matter at the outset, John Doe simply responded that he did not believe he engaged in any wrongful conduct. Thereafter, UCSB did not engage in any further attempts at early resolution.

62.    Consequently, Ms. Perkin commenced a formal investigation. The evidence received and/or gathered during the investigation process consisted of interviews with John

Doe, Jane Doe, Witness B.R., Witness L.B., Witness C.B., Witness M.M., Witness F.T., Witness D.J., Witness C.W., and text message conversations between C.B. and D.J. (the "First Investigative Report"), and text message conversations between L.B. and Jane Doe, Facebook messages between M.M. and Jane Doe; text messages exchanged between Jane Doe and C.B., and messages exchanged on Facebook between Jane Doe and an individual named "Juliana Amarah" (the "Second Investigative Report").

63.    On November 25, 2014, John Doe was advised that a hearing would take place before the Committee on December 11, 2014. UC Santa Barbara's policies explicitly provide that a student must be informed in writing of the following at least *five days* prior to the hearing: (i) the specific charges brought against him or her and a brief statement about the factual basis; (ii) the time and place of the hearing; and (iii) the student's rights at the hearing with regard to the presentation of evidence and questioning of witnesses.

64.    Nonetheless, the First Investigative Report was withheld from John Doe until *two days* before the First Hearing date, even though the final witness interview was conducted by Ms. Perkin fifteen days prior, on November 24, 2014. Thus, UCSB violated its own policies and procedures by failing to timely inform John Doe of the charges against him, and failing to provide him reasonable access to the evidence acquired.

65.    Upon his review of the documents, John Doe immediately contacted Ms. Perkin to advise her of the various inconsistencies contained within the First Investigative Report; for instance, the First Investigative Report indicated that Jane Doe was not in bed with John Doe when he woke up in the morning, even though John Doe had advised Ms. Perkin in the interview that Jane Doe was in bed with him when he woke up. However, Ms. Perkin declined to revise the inaccurate information.

66.    Moreover, the University of California Policy on Sexual Harassment and Sexual Violence provides that "the complainant and accused may each have a representative present

when he or she is interviewed, and at any subsequent proceeding or related meeting." Accordingly, on December 16, 2014, upon learning of the Committee's request to conduct a second hearing, John Doe advised Ms. Perkin that his attorney would be available any day during the week, except for December 19, 2014. Nonetheless, the Hearing proceeded on December 19, the one day on which his attorney was unavailable. Jane Doe's advocate was present for both the First and Second Hearings.

67.   Moreover, the Second Investigative Report was withheld from John Doe until a mere *three and a half hours* before the Second Hearing date, at a time when UCSB was well aware that John Doe's attorney was unavailable. Thus, not only was John Doe provided an insufficient amount of time to fully review the evidence and testimony against him, but he also was denied the opportunity to review this new evidence with counsel prior to the Second Hearing.

68.   Thus, UCSB deprived John Doe of the opportunity to effectively prepare his defense and consult with his attorney prior to the Second Hearing, in violation of UCSB's own stated guidelines and his rights to fair process under Federal and State law.

69.   UCSB's failure to conduct a thorough and impartial investigation was further demonstrated by the inclusion of irrelevant and highly inflammatory statements in the First Investigative Report. Specifically, the First Investigative Report contained testimony from Witness C.B., an individual who did not attend the trip to Lake Tahoe. Ms. Perkin acknowledged in the First Investigative Report that C.B. was not present on the trip, yet still portrayed her testimony as relevant on the grounds that C.B. "had the most contact with [Jane Doe] since [the Incident]." Thus, Ms. Perkin included the testimony of C.B. in the First Investigative Report for the sole purpose of reiterating the testimony provided by Jane Doe herself, in order to provide corroboration for Jane Doe's account.

70.     Furthermore, the First Investigative Report also contained twelve pages of highly prejudicial text messages exchanged between D.J. and C.B., two girls who were not in the room at the time of the Incident. For instance, the text messages between D.J. and C.B. suggested that John Doe had a history of being intimate with girls on the Mock Trial Team when they were very drunk. Yet, when the witnesses were questioned at the First Hearing about whether John Doe had ever engaged in sexual intercourse with, or taken advantage of, a girl on the Mock Trial Team, *every* witness responded "no". In fact, in John Doe's three years of competing on Mock Trial, the only sexual activity engaged in with a fellow member of the Mock Trial Team was when Witness D.J. initiated a kiss with John Doe. This was verified by D.J. herself at the First Hearing, when she testified that her one sexual encounter (kissing only) with John Doe was very brief, consensual and non-predatory. Evidently, the text messages between C.B. and D.J. were incorporated in the First Investigative Report for the sole purpose of attacking John Doe's character while bolstering Jane Doe's allegations of sexual misconduct.

71.     As the testimony provided by C.B., and the text messages exchanged between C.B. and D.J. were entirely based on hearsay and provided no independent knowledge of the Incident, this information should have been disregarded by the Committee. The inclusion of this uncorroborated and highly prejudicial evidence demonstrates an investigation process that was neither fair nor impartial.

**V.      The Investigative Reports Presented a Skewed Rendition of the Facts**

72.     The Investigative Reports provided a skewed rendition of the facts, mischaracterized witness statements and ignored important qualifying statements all in an effort to fit within the narrative that John Doe was guilty of engaging in non-consensual sexual activity with Jane Doe.

73.     The various eyewitness statements that directly contradicted Jane Doe's account of events include the following:

- 18 -

- Jane Doe stated that she was sitting on the couch when L.B. "tugged" her into the master bedroom where John Doe and B.R. were waiting. However, John Doe, B.R., L.B., D.J. and F.T. all indicated in their statements that the girls were already in the master bedroom when John Doe and B.R. arrived.

- Jane Doe indicated that upon entering the master bedroom, she laid down on the bed. However, both John Doe and B.R. specifically stated that Jane Doe was sitting up on the bed when they entered the master bedroom. Further, the First Investigative Report conveniently omitted a significant statement from D.J.'s testimony; namely, that just prior to the Incident, Jane Doe was "fine" and even "energetic" and "bubbly."

- The summary of Ms. Perkin's interview with B.R. on November 13, 2014 mischaracterized B.R.'s testimony to imply that Jane Doe began falling asleep almost immediately after B.R. went over to her in the bed. However, portions of B.R.'s testimony were selectively omitted from the First Investigative Report, in order to match the witness testimony with Jane Doe's narrative of the Incident. Specifically, Ms. Perkin deliberately omitted the following from B.R.'s account: that at the time of the "switch" Jane Doe was sitting up in bed and smiling; that Jane Doe did not seem intoxicated; that he and Jane Doe kissed for approximately ten minutes before he began to have impotence issues and feel very nauseous; and that after resting his head on the bed for approximately two to five minutes, he *then* noticed that Jane Doe had fallen asleep.

- The First Investigative Report takes at face value Jane Doe's statement that B.R. made a comment about how having sex with her would have been like "necrophilia". However, B.R. testified at the First Hearing that he did *not* recall making any such comment about Jane Doe's condition.

- The notes from Ms. Perkin's investigative interview with L.B. suggest that Jane Doe was "completely out of it" as soon as the "switch" occurred. However, at the First Hearing, L.B. explicitly stated that B.R. and Jane Doe engaged in sexual activity for ten to fifteen minutes, before B.R. left the room and before Jane Doe fell asleep.

- The First Investigative Report mischaracterized John Doe's testimony as stating that Jane Doe was not in the bed when he woke up in the morning. However, John Doe explicitly stated

in his interview that he *did* believe Jane Doe was in the bed with him when he woke up the next morning. While this may seem like a minor detail in the overall investigation, it is significant in that it demonstrates Ms. Perkin's apparent manipulation and/or incorrect transcription of John Doe's testimony, in order to comport with the testimony provided by Jane Doe (who stated she woke up before John Doe and left before he woke up.) Once again, upon John Doe's review of the First Investigative Report, he immediately advised Ms. Perkin of this inaccurate information; however, she again refused to revise her incorrect transcription of John Doe's testimony.

74.    Further demonstrating the First Investigative Report's skewed rendition of the facts, Ms. Perkin's summary of her interview with L.B. on November 7, 2014 indicates that she never even asked L.B. about Jane Doe's condition leading up to and during the Incident, despite the fact that L.B. had been with Jane Doe the entire evening. Undoubtedly, failing to question an eyewitness about Jane Doe's condition just prior to and during the sexual activity was either a significant error, or an intentional oversight. Subsequently, when questioned at the Second Hearing about Jane Doe's capacity, L.B. testified that nothing about Jane Doe's demeanor indicated to her that Jane Doe was overly intoxicated.

75.    Evidently, the First Investigative Report provided a skewed rendition of the facts, mischaracterized witness statements and ignored important qualifying statements in order to fit within Jane Doe's narrative of the events. In an attempt to defeat the First Investigative Report's misrepresentation that Jane Doe was unable to consent, John Doe questioned each witness at the Second Hearing as to the amount of time that elapsed between their last interaction with Jane Doe prior to the sexual activity, and their observations of Jane Doe's condition at that time. D.J. indicated that she had interacted with Jane Doe approximately one minute before Jane Doe engaged in sexual activity with John Doe; and L.B. and B.R. each indicated that they had interacted with Jane Doe mere seconds before the sexual contact with John Doe. Notably, D.J., L.B. and B.R. all testified that Jane Doe was "fine" just prior to, and during, the Incident, and

did not exhibit any conduct which would indicate that she was intoxicated and/or unable to provide consent. Nonetheless, the Committee viewed Jane Doe's account as more credible than numerous contradictory eyewitness accounts.

76.     Overall, the First Investigative Report's cherry-picked statements from the witnesses' observations, the omission of key, qualifying facts and the manipulation of supporting facts, combined with Ms. Perkin's mischaracterizations of the witnesses' accounts led to the predetermined conclusion that Jane Doe was not capable of consenting to the sexual activity with John Doe.

**VI.     Gender Bias Against John Doe as the Male Accused**

77.     Pursuant to the U.S. Department of Education Office of Civil Rights Guidelines and UCSB's own stated guidelines, UC Santa Barbara was required to conduct an impartial and unbiased investigation process.

78.     Upon information and belief, there have been no reported incidents of male complainants against female students at UCSB for sexual assault and/or no reported incidents of female accused students being disciplined for sexual misconduct against male complainants.

79.     Upon information and belief, UCSB is knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

80.     Upon information and belief, UCSB's guidelines and regulations are set up to disproportionately affect the male student population of the UCSB community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

81.     UC Santa Barbara conducted an investigation and adjudication that was markedly biased against John Doe as the male accused by placing an additional burden of proof upon John Doe, by denying John Doe the opportunity to present witnesses and evidence

favorable to his defense, and by prohibiting him from presenting evidence to refute irrelevant and unsubstantiated character evidence against him.

82. As noted above, a mere two days prior to the First Hearing, John Doe received a copy of the First Investigative Report. Upon his review, he immediately notified Ms. Perkin of the inaccurate information and inconsistencies contained within the Report, including the incorrect transcription of his own testimony. However, Ms. Perkin declined to revise the First Investigative Report, advising John Doe that he could address the inconsistencies at the First Hearing. In knowingly submitting an inaccurate and deceitful report to the Committee, UCSB improperly placed an additional burden on John Doe to disprove the accuracy of the information contained within the report, evidencing a clear gender bias against John Doe as the male accused.

83. Further, at the First Hearing, John Doe requested the opportunity to produce witnesses that could testify to his character and credibility. The Committee denied his request, on the grounds that UCSB does not permit the admission of character evidence in an investigative university hearing. Nonetheless, the Committee did admit extensive character evidence *against* John Doe in the form of uncorroborated and highly prejudicial statements and text messages exchanged between individuals who were not present at the time of the Incident. Among the highly inflammatory messages submitted to the Committee were the following: "[John Doe and B.R. are] out of control;" "[John Doe] gets away with everything;" "it makes me apprehensive to be around [John Doe and B.R.];" "I'm kinda scared now…and both of those boys have histories of hookin [sic] up with the freshmen girls on [Mock Trial] when the girls are super drunk…;" "how can we knowingly allow other girls to join [Mock Trial];" and "since this trip Mock Trial has instituted a no Mock sex policy, but that this has been heavily broken especially by [John Doe] and B.R." Despite the lack of any corroboration or verification, the Committee considered these subjective allegations in making an assessment as to John Doe's

character. Notably, John Doe's request to refute such character evidence with character evidence of his own was denied, evidencing a clear gender bias in the investigation process.

84.     While John Doe was not permitted to present any character evidence in support of his defense, a disproportionate amount of time was spent at the First Hearing discussing B.R.'s previous sexual behavior, an issue wholly irrelevant to the subject Incident. D.J. testified at length about three to four sexual encounters that occurred between B.R. and other girls (who were not present to verify or deny such allegations), and characterized such encounters as "assaults". Although this testimony was clearly immaterial to the Incident at issue, the Committee nonetheless considered it in forming an assumption about John Doe's character. The consideration of one male's alleged sexual history, and imputation of such behavior onto another male (John Doe), was entirely incongruous and a clear demonstration of gender bias against the male accused.

85.     Moreover, while extraneous information about John Doe's sexual propensity and character was admitted during the hearings, the Committee prohibited the introduction of evidence related to Jane Doe's propensity and character. For instance, the Committee readily accepted evidence regarding John Doe's previous receipt of speeding tickets, while refusing to admit evidence related to Jane Doe's propensity for dishonesty and reputation for fabricating stories. Inexplicably, the Committee deemed evidence relative to John Doe's driving history relevant to the facts at issue, while evidence related to Jane Doe's propensity for lying was not.

86.     Furthermore, John Doe was denied the opportunity to thoroughly question witnesses at the First Hearing in violation of his rights to fair process and UCSB's own policies.

87.     For instance, focusing on the essential issue of Jane Doe's credibility, John Doe asked L.B. at the First Hearing whether Jane Doe's behavior had ever indicated to her that Jane Doe was a dishonest person. L.B. began to answer the question by identifying the previous instances where she had caught Jane Doe in a lie, but the Committee stopped her, directing L.B.

to limit her testimony to the events of June 16, 2014 only. Similarly, at the Second Hearing, John Doe asked L.B. what Jane Doe had stated repeatedly on the night of the Incident ("Let's do something crazy! I want to do something crazy!"). However, the Committee did not permit L.B. to answer the question directly; rather, they instructed L.B. to clarify that the statements made by Jane Doe did not specifically indicate that she wanted to have group sex. Although John Doe's witness questions were aimed at the essential elements of consent and credibility, the Committee engaged in a biased and selective fact finding process by preventing the witnesses from providing responses unfavorable to Jane Doe's allegations.

88.    Moreover, the Committee considered highly prejudicial evidence that was neither investigated nor validated prior to its inclusion in the Second Investigative Report. Specifically, the Second Investigative Report included messages exchanged on Facebook between L.B. and an individual named "Juliana Amarah" regarding the Incident and its alleged effects on Jane Doe.  Jane Doe alleged that "Juliana Amarah" was a friend from her equestrian club "Eurocircuit" who attended Princeton University and traveled to Russia with her over the summer. Despite John Doe's expressed skepticism to UCSB as to the veracity of these messages, upon information and belief, UCSB did not take any actions to confirm their authenticity prior to their inclusion in the Second Investigative Report.

89.    Subsequent to the issuance of the Decision, John Doe discovered that it was highly probable "Juliana Amarah" was a fictitious individual created by Jane Doe for the sole purpose of fabricating Facebook messages that would support her account of the events. Thus, the acceptance of such unscrupulous evidence at face value demonstrated a clear lack of objectivity in the fact finding process.

90.    John Doe submitted an appeal of the Decision on January 29, 2015. Among the various grounds for his appeal was the discovery of new important evidence not known at the time of the hearing; namely, that Jane Doe apparently created a fictitious individual for the sole

purpose of providing corroboration for her account of the events. However, John Doe's presentation of this newly discovered evidence went ignored and Chancellor Henry T. Yang denied the appeal on February 16, 2015, stating simply "After reviewing your appeal, I am affirming Vice Chancellor Young's decision."

91.     UCSB's disparate and discriminatory treatment of John Doe was also evident in its Decision of December 11, 2014. While the testimony from at least four eyewitnesses indicated Jane Doe was conscious, coherent and capable of providing consent for the sexual activity with John Doe, the Committee nonetheless found Jane Doe's account more credible than John Doe's.

92.     Thus, the Committee's reliance on Jane Doe's unsupported statements when specifically contradicted by every other eyewitness account evidenced a clear gender bias against the male accused in violation of Title IX.

## VII.     Failure to Abide by the Requisite Preponderance of the Evidence Standard

93.     The U.S. Department of Education Office of Civil Rights and UCSB's policies provide that an investigator shall apply a preponderance of the evidence standard to determine whether there has been a violation of its sexual misconduct policies.

94.     The preponderance of the evidence standard does not equate to judging the accused student as guilty until proven innocent. In fact, nowhere in the U.S. Department of Education's Guidelines or UCSB's policies is such a standard referenced.

95.     However, UCSB's investigation process demonstrated a clear gender bias which resulted in a Decision that did not afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard.

96.     The Committee improperly placed the burden of proof on John Doe to establish that Jane Doe consented to the sexual activity, instead of placing the burden of proof on Jane Doe, the complainant, to establish that she did not consent.

97.     UCSB's policies define "consent" in relevant part as follows:

> Consent is informed. Consent is an affirmative, unambiguous, and conscious decision by each participant to engage in mutually agreed-upon sexual activity.

> Consent is voluntary. It must be given without coercion, force, threats, or intimidation. Consent means positive cooperation *in the act or expression* of intent to engage in the act pursuant to an exercise of free will.

98.     Subsequent to the hearing, John Doe learned that the Committee's Decision came down to the fact that neither B.R., nor L.B. or D.J. heard Jane Doe explicitly say "yes" to the sexual encounter with John Doe. However, each witness explicitly stated that Jane Doe did not say "no," indicate "no" through her actions or expressions, or that she was incapable of doing so.

99.     Moreover, John Doe testified that Jane Doe expressed consent through both her words and actions. Jane Doe demonstrated her consent verbally by agreeing to participate in the group sex, by encouraging John Doe with her words while he performed oral sex on her, and by expressing to him that she enjoyed what he was doing. Jane Doe also indicated her consent through actions, by rubbing her hands through John Doe's hair, assisting in the removal of clothing and by switching positions multiple times (which included her being on top of John Doe) while she and John Doe engaged in sexual intercourse.

100.    Notably, L.B. testified at the First Hearing that both D.J. and Jane Doe said they were interested in having group sex with B.R. and John Doe, before the idea was even presented

to John Doe. Additionally, D.J. testified that upon entering the room and learning of the girls' proposition, John Doe specifically asked, "are we really going to do this?" At that point, Jane Doe could have easily demonstrated a lack of consent by leaving the bedroom on her own volition. However, she chose not to do so and instead verbally indicated "yes" in response to John Doe's question.

101.    Accordingly, the Decision clearly did not afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard. Rather, the Committee improperly placed the burden of proof on John Doe to establish that Jane Doe consented to the sexual encounter, instead of placing the burden of proof on Jane Doe, the complainant, to establish that she did not consent.

**VIII.  The Sanction Was Unwarranted and**
**Disproportionate in Light of the Circumstances**

102.    The Sanction assessed to John Doe was disproportionate and unwarranted in light of the circumstances.

103.    UCSB meted out the unwarranted Sanction of a two-quarter suspension to John Doe, notwithstanding the lack of evidence in support of Jane Doe's allegations of non-consensual sexual activity and despite contradictory eyewitness testimony.

104.    The Sanction was disproportionate on the following grounds: (1) John Doe was not a student at UCSB at the time of the Incident, as he had taken a leave of absence; (2) Jane Doe was not a current student at UCSB at the time of the Incident, as the semester had concluded and her transfer to a University on the east coast had been finalized several months prior; (3) there was no reasonable risk of future harm to Jane Doe as she was no longer a member of the UCSB community; (4) a crime was not reported to the criminal authorities; (5) John Doe had no prior history of disciplinary proceedings; and (6) the investigation was clearly biased against John Doe as the male accused.

105.    Based on the foregoing, the Sanction was unjustified and disproportionate to the alleged offense in violation of John Doe's rights to fair process.

## AS AND FOR A FIRST CAUSE OF ACTION

### Violation of Title IX of the Education Amendments of 1972

106.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

107.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

108.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

109.    Upon information and belief, Defendant UCSB receives federal funding for research and development.

110.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*).

Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

111.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[3]

112.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint..."[4]

113.    A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [5]

---

[2]  *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

[3] *Id.* at 22 (emphasis added).

[4] *Id.* at 20.

[5] *Id.* at 21.

114.    Based on the foregoing, *supra,* at ¶¶ 32-105, Defendant UCSB has deprived John Doe, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant UCSB's guidelines and regulations.

115.    Based on the foregoing, *supra,* at ¶¶ 32-105, Defendant UCSB conducted its investigation of the events of June 16, 2014 and subsequent investigation and review, in a manner that was biased against the male being accused. From the outset, the investigation and hearings were slanted in favor of Jane Doe and took her statements at face value. Absent from the Decision or the Sanction is corroboration for Jane Doe's allegations that she was intoxicated and therefore unable to consent to the sexual activity with John Doe.

116.    UCSB has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt.   Such a one-sided process deprived John Doe, as a male student, of educational opportunities at UCSB on the basis of his sex.

117.    During the investigation, no credible or reliable evidence was presented in support of Jane Doe's claim that she lacked the ability to consent; to the contrary, all of the eye-witnesses to her behavior on June 16, 2014 concurred that she was in control, fully conscious and not overtly intoxicated.   Notwithstanding, Defendant UCSB accepted Jane Doe's claim that she lacked the ability to consent over John Doe's claim that not only was Jane Doe fully in control and capable of giving consent, but she also was an active and willing participant in the sexual activity. Such an outright acceptance of the uncorroborated female's account over the substantiated male's account reveals gender discrimination against the male accused in UCSB'S investigation and adjudication process.

118.    Defendant UCSB had no intention of following its own policies and procedures for John Doe as the male accused of sexual misconduct when it found John Doe responsible for

sexual assault in the face of contradictory witness statements demonstrating Jane Doe was not incapacitated.

119.    Defendant UCSB'S stated policies and procedures, together with its violations thereof with respect to John Doe only, as the male accused of sexual assault, demonstrates Defendant UCSB'S gender-biased practices with respect to males accused of sexual assault at UCSB.

120.    Based on the foregoing, *supra,* at ¶¶ 32-105, UCSB has deprived John Doe, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of UCSB's guidelines and regulations.

121.    Based on the foregoing, *supra,* at ¶¶ 32-105, UCSB suspended John Doe from UCSB without allowing John Doe an adequate opportunity to review and contest the specific allegations, and without conducting a full and fair investigation to corroborate Jane Doe's unsubstantiated account.

122.    Based on the foregoing, *supra,* at ¶¶ 32-105, UCSB conducted its investigation of Jane Doe's allegations in a manner that was biased against the male being accused. The investigation was slanted in favor of Jane Doe and took her statements at face-value, while disregarding John Doe's statements and the corroborating eyewitness accounts.

123.    Throughout the investigation and adjudication process, UCSB treated John Doe as "guilty before proven innocent."

124.    Upon information and belief, UCSB erroneously placed the entire burden on John Doe to prove his innocence, instead of placing the burden on Jane Doe, the complainant, to establish his guilt.

125.    Based on the foregoing, *supra,* at ¶¶ 32-105, Defendant UCSB imposed sanctions on John Doe that were disproportionate to the severity of the charges levied against

him to fulfill their ulterior motive of removing him from the school regardless of his guilt or innocence.

126.    Based on the foregoing, *supra,* at ¶¶ 32-105, Defendant UCSB's guidelines and regulations are set up to disproportionately affect the male student population of the UCSB community as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

127.    Based on the foregoing, *supra,* at ¶¶ 32-105, male respondents in sexual misconduct cases at UCSB are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

128.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

129.    **AS AND FOR A SECOND CAUSE OF ACTION**
130.    **Breach of Contract**
131.

132.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

133.    Based on the aforementioned facts and circumstances, Defendant UCSB breached express and/or implied agreement(s) with John Doe.

134.    Defendant UCSB committed several breaches of its agreements with John Doe, including, without limitation:

> In order to carry on its work of teaching, research, and public service, the University has an obligation to maintain conditions under which the work of the University can go forward freely, in accordance with the highest standards of quality, institutional integrity, and freedom of expression, with full recognition by all

- 32 -

concerned of the rights and privileges, as well as the responsibilities, of those who compose the University community.

The University is committed to creating and maintaining a community where all individuals who participate in the University programs and activities can work and learn together in an atmosphere free of harassment, exploitation, or intimidation.

Proceedings will provide a *prompt, fair, and impartial* investigation and resolution.

Students who are subject to University discipline shall be afforded procedural due process, which is a basic principle underpinning the proper enforcement of University policies and campus regulations. The primary purpose of any University disciplinary proceeding is to determine the guilt or innocence of the accused student.

The investigator shall apply a preponderance of the evidence standard to determine whether there has been a violation of this Policy.

135.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

136.    John Doe is entitled to recover damages for Defendant UCSB's breach of the express and/or implied contractual obligations described above.

137.    As a direct and proximate result of the above conduct, actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

138.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

139.    **AS AND FOR A THIRD CAUSE OF ACTION**

140.    **Violation of the Covenant of Good Faith and Fair Dealing**

141.

142.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

143.    Based on the aforementioned facts and circumstances, Defendant UCSB breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe by meting out a disproportionate Sanction of a two-quarter suspension, notwithstanding the lack of evidence in support of Jane Doe's allegations of non-consensual sexual activity.

144.    As a direct and foreseeable consequence of these breaches, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

145.    John Doe is entitled to recover damages for Defendant UCSB's breach of the express and/or implied contractual obligations described above.

146.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

147.    **AS AND FOR A FOURTH CAUSE OF ACTION**

**Promissory Estoppel**

148.     John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

149.     UCSB's various policies constitute clear and unambiguous representations and promises that UCSB should have reasonably expected to induce action or forbearance by John Doe.

150.     UCSB expected or should have expected John Doe to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that UCSB would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of UCSB's policies.

151.     John Doe reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by UCSB.

152.     Based on the foregoing, UCSB is liable to John Doe based on Promissory Estoppel.

153.     As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

154.     As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Negligence

155.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

156.    UCSB owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in the conduct of an impartial and thorough investigation of the allegations of sexual misconduct against him.

157.    UCSB breached its duties owed to John Doe.

158.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

159.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress

160.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

161.    UCSB owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair and impartial manner.

162.    UCSB breached its duties owed to John Doe.

163.    Such breach by UCSB created an unreasonable risk of causing John Doe emotional distress in that John Doe's academic and disciplinary record is irrevocably and irreversibly tarnished.

164.    As a direct and foreseeable consequence of UCSB's actions, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of

educational and career opportunities, economic injuries, and other direct and consequential damages.

165.    The emotional distress was severe enough that it has resulted in illness and/or mental harm to John Doe, namely, John Doe has suffered from insomnia and anxiety since the commencement of the subject investigation, resulting in a significant decline in his grade point average, as well as substantial weight gain.

166.    UCSB's extreme and outrageous conduct was the cause of John Doe's distress.

167.    Considering that John Doe's entire academic and future employment opportunities would suffer as a result of the adverse decision, UCSB should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

168.    John Doe's distress is reasonable in light of UCSB's conduct.

169.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Violation of California Civil Code § 51

170.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

171.    The California Civil Code § 51, also known as the Unruh Civil Rights Act provides:  "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever."

172.    UCSB's policies provide, among other things:

> In compliance with Federal regulations implementing Title IX of
> the Education Amendments of 1972 and applicable Federal and
> State laws pertaining to sex discrimination, University of
> California policy prohibits unlawful discrimination on the basis of
> sex.

173.    UCSB is a "business establishment" within the meaning of California Civil Code § 51. Upon information and belief, UCSB maintains physical facilities, employs a significant number of paid faculty and staff, provides an education and academic experience to students, receives applications for admission from the general public, receives tuition payments and fees from its students and is governed by the University of California Board of Regents.

174.    Based on the foregoing *supra,* at ¶¶ 77-92, UCSB intentionally discriminated against John Doe on the basis of his sex.

175.    Based on the foregoing *supra,* at ¶¶ 77-92, UCSB denied John Doe the advantages, facilities, privileges and services afforded to students of UCSB by, among other things: conducting an investigation and adjudication process biased against the male accused; failing to afford John Doe the rights enumerated in its own guidelines and policies; failing to utilize the requisite preponderance of the evidence standard; and assessing a sanction that was disproportionate and unwarranted in light of the circumstances.

176.    Based on the foregoing *supra,* at ¶¶ 77-92, Defendant UCSB intentionally engaged in the following discriminatory acts or practices against John Doe as the male accused: UCSB subjected John Doe to disciplinary action in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex; upon accepting Jane Doe's uncorroborated account of the events, the Committee discriminated against John Doe, based solely on his gender; the Decision reached was discriminatory in that given the evidence (or

lack thereof), a discriminatory bias against males was required for a conclusion of sexual misconduct to be reached.

177.    Based on the foregoing facts and circumstances, UCSB engaged in unlawful discriminatory practices in violation of California Civil Code § 51.

178.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

179.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Violation of Due Process Rights Under 42 U.S.C. § 1983

180.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

181.    The Fourteenth Amendment of the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law."

182.    The Fifth Amendment of the United States Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law…"

183.    The Fourteenth and Fifth Amendments' due process protections are required in higher education disciplinary decisions, including the disciplinary decisions issued under UCSB's policies.

184.    UCSB has an obligation to perform a fundamentally fair and reliable investigation and adjudication process.

185.    UCSB's policies provide, among other things:

> Students who are subject to University discipline shall be afforded procedural due process, which is a basic principle underpinning the proper enforcement of University policies and campus regulations. The primary purpose of any University disciplinary proceeding is to determine the guilt or innocence of the accused student.

186.    A person has a protected interest in his good name, reputation, honor and integrity which a state cannot deprive him of absent due process.

187.    A person has a protected interest in pursuing his education, as well as his future educational and employment opportunities and occupational liberty, which a state cannot deprive him of absent due process.

188.    A person has a protected interest in his education and acquiring knowledge, which a state cannot deprive him of absent due process.

189.    John Doe had a constitutionally protected interest in his good name, reputation, honor and integrity.

190.    John Doe had a constitutionally protected interest in his education and future educational and employment opportunities and occupational liberty.

191.    John Doe had a constitutionally protected property interest in continuing and finishing his education at UCSB.

192.    UCSB investigated, adjudicated and disciplined John Doe in a manner that deprived him of his constitutionally protected rights, without due process. A non-exhaustive list of UCSB's violations are as follows:

- John Doe was not provided with a copy of the First Investigative Report until *two days* before the First Hearing date even though the final witness interview was conducted by Ms. Perkin fifteen days prior, on November 24, 2014; thus, UCSB denied John Doe the opportunity to effectively and fully prepare his defense;

- John Doe was not provided with a copy of the Second Investigative Report until a mere *three and a half hours* before the Second Hearing, depriving him of a sufficient amount of time to fully review the evidence and testimony against him and prepare a response;

- John Doe was denied the right to be accompanied by counsel at the Second Hearing as Ms. Perkin scheduled the hearing for the one day on which John Doe had advised his attorney would not be available; thus, UCSB deprived John Doe of his right to effectively prepare his defense and consult with his attorney;

- John Doe was prohibited from making a statement or submitting any evidence in support of his defense at the Second Hearing;

- John Doe was banned from presenting character evidence favorable to his defense, to rebut the unsubstantiated and misleading character evidence submitted against him;

- John Doe was denied the opportunity to thoroughly cross-examine all witnesses against him;

- John Doe's expressed skepticism as to the veracity of the Facebook messages produced by "Juliana Amarah" went ignored by UCSB; and

- Despite the severe implications and significant effects of its Decision, UCSB failed to cite the bases for its denial of John Doe's appeal, or provide any explanation whatsoever for its decision.

193.   As a result of the foregoing, UCSB acted under color of state law in violating John Doe's due process rights under the Fifth and Fourteenth Amendments of the United States Constitution.

194.   UCSB acted with intentional disregard of John Doe's due process rights.

195.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

196.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A NINTH CAUSE OF ACTION
### Declaratory Judgment

197.    John Doe repeats and realleges each and every allegation hereinabove as if fully set forth herein.

198.    UCSB has committed numerous violations of the Parties' contracts and of federal and state law.

199.    John Doe's education and future career has been severely damaged.  Without appropriate redress, the unfair outcome will continue to cause irreversible damages to John Doe's future educational and employment prospects, with no end in sight.

200.    As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of John Doe's formal student record at UCSB.

201.    By reason of the foregoing, John Doe requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by the Comittee at UCSB be reversed; (ii) John Doe's reputation be restored; (iii) John Doe's disciplinary record be expunged; (iv) the record of John Doe's suspension from UCSB be removed from his education file; (v) any record of the complaint against John Doe be permanently destroyed; and (vi) UCSB's rules, regulations and guidelines are unconstitutional as applied.

## **PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, John Doe demands judgment against Defendant the University of California at Santa Barbara as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)    on the third cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for promissory estoppel, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and

loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for negligence, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)     on the sixth cause of action for negligent infliction of emotional distress, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)     on the seventh cause of action for violation of California Civil Code § 51, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(viii)     on the eighth cause of action for violation of due process rights under 42 U.S.C. § 1983, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

1    (ix)    declaratory judgment pursuant to 28 U.S.C. § 2201, a judicial declaration that:

2    (i) the outcome and findings made by UCSB be reversed; (ii) John Doe's reputation be

3    restored; (iii) John Doe's disciplinary record be expunged; (iv) the record of John Doe's

4    suspension from UCSB be removed from his education file; (v) any record of the complaint

5    filed against John Doe's be permanently destroyed; and (vi) UCSB's rules, regulations and

6    guidelines are unconstitutional as applied; and

7    (x)    awarding John Doe such other and further relief as the Court deems just,

8    equitable and proper.

### JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter

**Dated:   New York, New York**

**April 1, 2015**

                                                    **GINZBURG & BRONHTEYN, LLP**

                                                    **By:**_____*yasha bronshteyn*_____
                                                    **Yasha Bronshteyn**
                                                    **11111 Santa Monica Blvd**
                                                    **Suite 1840**
                                                    **Los Angeles, California 90025**

                                                               **-and-**

                                                    **NESENOFF & MILTENBERG,LLP**

                                                    **Andrew T. Miltenberg, Esq (*pro hac
                                                    vice* admission pending)**
                                                    **Kimberly C. Lau, Esq.  (*pro hac vice*
                                                    admission pending)**
                                                    **Tara J. Novack, Esq. (*pro hac vice*
                                                    admission pending)**
                                                    **363 Seventh Avenue, Fifth Floor**
                                                    **New York, New York 10001**
                                                    **(212) 736-4500**
                                                    **amiltenberg@nmllplaw.com**
                                                    **klau@nmllplaw.com**
                                                    **tnovack@nmllplaw.com**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28